IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

STATE OF NEW MEXICO, *ex rel.*
State Engineer,
      Plaintiff,
  v.                                    **66cv06639** MV-LCS-ACE

R. LEE AAMODT, *et al.*,
      Defendants,

     and

UNITED STATES OF AMERICA,
PUEBLO DE NAMBÉ,
PUEBLO DE POJOAQUE,
PUEBLO DE SAN ILDEFONSO,
and PUEBLO DE TESUQUE,
      Plaintiffs-in-Intervention.

## MAGISTRATE JUDGE'S PROPOSED FINDINGS
## AND RECOMMENDED DISPOSITION

**THIS MATTER** is a part of the general stream system adjudication of all water rights in the Rio Pojoaque stream system. It is before the Court on the State of New Mexico's September 12, 2002 motion and memorandum (Docket Nos. 5991-2) requesting a preliminary injunction against the Pueblo of Pojoaque and its use of water in excess of an amount approved by the Court and its continued development of projects which require additional water rights. On September 12, 2002, United States District Judge Edwin L. Mechem referred the Motion to me pursuant to 28 U.S.C. Section 636 (b)(1)(B). September 13, 2002 Order (No. 5993). I heard oral argument on the Pueblo's motion to dismiss on November 19, 2002 and on the merits of the motion for a preliminary injunction on November 26, 2002. On December 16, 2002, I filed a <u>Notice of Filing of Transcript of</u>

<u>Hearing</u> (No. 6040).  On December 31, 2002, the case was transferred to United States District Judge Martha Vázquez (No. 6041).

Having considered the motions, memoranda, the parties' briefs, testimony, exhibits, and the applicable law, I find that the motions are not well taken.  I recommend that the Pueblo of Pojoaque's motion to dismiss be **DENIED** with prejudice and that the State's motion for a preliminary injunction be **DENIED** without prejudice.

**BACKGROUND:**  This summary of the matters considered and events occurring since 1966 is set forth below to present a brief history of this case and to illustrate the degree to which various issues have been previously considered.  It is not all inclusive.

**<u>Participants and Rights Adjudicated</u>:**  The case was filed on April 20, 1966 by the State of New Mexico (without docket number)[1] and assigned to Judge Verne Payne.  On April 10, 1978, the case was transferred from Judge Payne to Judge Mechem.  Judge Mechem presided until November 2002.  The case was transferred to Judge Vázquez on December 31, 2002.

In 1967, the Court appointed Edward L. Yudin, Esq. as special master and he served until November 1985.  In 1988, first, Joe W. Wood, Esq. and then, James Musgrove, Esq. served in that capacity.  On September 1, 1989, the Court appointed Harl D. Byrd, Esq. as special master (No. 3306).  I am the magistrate judge assigned to the case and I have served

---

[1]  No docket numbers were assigned in this case until May of 1978.

as a settlement judge as well.  Arizona Superior Court Judge Michael Nelson presently serves as settlement judge for the case.  The action is stayed before the Special Master as the parties continue negotiating to settle most, if not, all the issues remaining.

All claimants on a stream system, including non-Indian entities, Indians, federal agencies, state agencies, municipalities, and water associations are joined to a water rights adjudication.  The State's 1966 Complaint named as defendants several hundred non-Pueblos, the United States, the Pueblos of Nambé, Pojoaque, San Ildefonso, and Tesuque.  Many other parties were joined as the case has progressed.

On November 1, 1966, the United States moved to intervene on behalf of itself and the Pueblos, as their trustee.  It also made claims for the U.S.D.A. Forest Service's holdings in the Santa Fe National Forest.  The motion was granted and the United States' Complaint-in-Intervention accepted February 13, 1967.  On the same day, the Court also entered an Order realigning parties so that the United States became a plaintiff.  On May 19, 1980, the Court denied (No. 477) the State's motion to disqualify the United States from representing the Pueblos' interests.

In May 1970, the Pueblos of Santo Domingo and San Felipe moved to intervene.  The Court denied the motion on July 27, 1971 and entered its Order on August 16, 1971.  The Pueblos appealed the ruling and on June 5, 1972, the Tenth Circuit Court of Appeals dismissed the appeal for failure to prosecute.

In 1976, the Tenth Circuit ruled that the four Pueblos in the case were entitled to representation by their own counsel as well as by the United States in its trust capacity.

3

New Mexico *ex rel.* Reynolds v. Aamodt, 537 F.2d 1102, 1106-7 (10th Cir. 1976), *cert. denied* 429 U.S. 1121 (1977). (Aamodt I).  The Pueblos filed their first <u>Complaint-in-Intervention</u> on November 12, 1974.  Although struck from the record by the Court's December 6, 1974 <u>Order</u>, that Complaint was subsequently allowed by the Court's June 27, 1978 <u>Amended Order on Mandate</u> (No. 3) following the entry of <u>Aamodt I</u>.  On September 21, 1978, the Pueblos filed a second <u>Complaint-in-Intervention</u> (No. 51).

On June 8, 1966 and on October 28, 1966, the State filed the hydrographic survey of non-Indian rights as required under N.M.S.A. 1978 Section 72-4-17.  Initially, non-Pueblo parties were joined based on the claimant inventory contained in the survey.  Non-Pueblo parties have been continually joined and dismissed from the case, as necessary, since then.  On October 15, 1979, the Court entered its <u>Order</u> (No. 236) denying certain non-Pueblo defendants' motion to maintain a class action and for certification of class.

Prior to December 1982, most of the non-Pueblo parties joined were irrigators.  Well owners were added individually if a request was made for their inclusion.  On December 1, 1982, the Court ordered (No. 629) the joinder of all domestic well permitees; that is, all claimants of wells drilled after March 18, 1907[2].  The next month, the Court entered its January 13, 1983 <u>Order</u> which limited withdrawals from domestic and livestock wells permitted after that date (post-1982 wells) (No. 641).  In 1984, the Court expanded the scope of the joinder to include all non-Pueblo claimants with priority dates before 1983. January 11, 1984 Order (No. 1482).  In 1993, the Court ordered the adjudication of all non-

---

[2] The New Mexico water code was adopted on this date and all uses developed thereafter had to be permitted. N.M.S.A. 1978 Section 72-5-1, Section 72-12-1.

Pueblo wells permitted after the entry of its <u>January 1983 Order</u>. May 21, 1993 Order (No. 4184). The Court has also allowed community ditch associations to be joined. April 13, 1984 Order (No. 1904).


**Technical Matters:** Water right adjudication courts determine water rights for three general groups: Indians, non-Indians and Federal agencies. Adjudications have three distinct segments: a) a subfile segment where the elements of water rights are determined as between the State and the claimant, b) an *inter se* segment where all claimants may challenge each water right proposed in the subfile segment, and c) a reconciliation segment where errors and omissions are cleaned up. The law, details, and elements vary for each group.

In the early 1990s, the State and the United States agreed to certain aspects of the Rio Pojoaque stream system hydrology and definitions of groundwater terms. April 20, 1990 Stipulation (No. 3420); July 26, 1991 Stipulation (No. 3794). The Special Master reported on additional hydrology matters on April 16, 1993 (No. 4163) and the Court adopted his <u>Report</u> on May 6, 1993 (No. 4178). The parties continued to work on hydrologic matters through the 1990s.

The Court has defined many aspects of quantification for both Pueblo and non-Pueblo rights. After reviewing stipulations and briefs and holding hearings, the Special Master filed his recommendations on quantification definitions, calculation procedures, and amounts. March 12, 1991 Special Master's Report Concerning Pueblos' Irrigation

Water Requirements (No. 3701) at pp. 38-46.  In October 1992, the Court adopted the recommendations except for one relating to cropping patterns. October 30, 1992 Order (No. 4052).  Later, the Court adopted the Special Master's recommendation to use the cropping pattern found in the State's 1966 Nambé-Pojoaque-Tesuque Hydrographic Survey. September 3, 1993 Order (No. 4217) at p. 2.  The Court also required that both Pueblos' and non-Pueblos' irrigation water requirements be determined using the SCS Modified Blaney-Criddle calculus. March 1991 Report at p. 43 as adopted by October 1992 Order at p. 4; March 2, 1994 Order at p. 7.

The following 1991 recommendations specifically apply to the present Findings: a) the Pueblos' water rights will be defined in terms of diversion and depletion; b) the farm delivery requirement defines a water right's diversion value; c) the farm delivery requirement in this case is 3.35 acre feet per year or annum (a/f/a); d) the weighted consumptive irrigation requirement defines a water right's depletion value, and e) the depletion value in this case for irrigation rights is 1.84 acre feet per annum (a/f/a). March 1991 Report at pp. 38-46 as adopted by October 1992 Order.  Diversion and depletion amounts are calculated by multiplying each value by the relevant amount of acreage. *Id.* at 45.

**Non-Pueblo Rights**:

**Procedural Matters**:  In 1990, the Special Master considered the form and content of a final decree for non-Pueblo water rights.  First, the water right elements detailed in

6

non-Pueblo subfile orders entered since 1966 had to be corrected and updated.  To address this problem, the Special Master contracted with a data management service experienced in managing New Mexico water adjudication data and preparing final decrees.  While some progress was made, ultimately, the parties were unable to commit the necessary resources and the project was set aside in the summer of 2000.  This work remains to be done.

Second, the Special Master made recommendations on June 10, 1991 (No. 3746) and on December 13, 1991 (No. 3885) regarding the form and content of the non-Pueblo final decree.  He made additional recommendations on January 25, 1993 (No. 4103) regarding the effective date of final decrees.  The Court adopted his recommendations on August 17, 1992 (No. 4013) and January 27, 1993 (No. 4105), respectively.

On March 2, 1994, the Court ruled that any water right subfile orders entered by the Court are not final. March 1994 Order at pp.3-4 (No. 4299).  This ruling on finality is inconsistent with that made by the New Mexico Supreme Court in New Mexico *ex rel.* Martinez v. Parker Townsend Ranch Co., 887 P.2d 1247 (N.M. 1994).


**Scheduling:**  In 1983, the Court ruled that Pueblo challenges to non-Pueblo rights would be stayed until non-Pueblo priorities were determined, that is, until the non-Pueblo subfile segment is completed. October 27, 1983 Order (No. 1459).  In 1987, the Court ordered the State to resolve all issues between itself and non-Pueblo defendants before beginning the *inter se* segment of the case.

The parties continued to work on non-Pueblo issues until the Court formally deferred their further consideration. March 18, 1993 Order (No. 4138).  In 1998, the Court declined to re-open the consideration of non-Pueblo priorities until the Pueblos' rights were substantially completed. February 26, 1998 Order (No. 5356) at p. 2.  The stay of these issues continues although Court has permitted review of issues related the administration of the stream system and development of a hydrologic computer model.  These two matters were stayed in late 1999. November 19, 1999 Stipulated Order (No. 5558).

In response to a request by settlement Judge Nelson, the State and the Court's staff attorney began updating current ownership for non-Pueblo claimants in the fall of 2002.

**Adjudication Progress:**  State law requires an accounting and adjudication of all water rights within the stream systems of New Mexico. N.M.S.A. 1978 Section 72-4-15. The statutes authorize an adjudication court to determine any question necessary to define the rights and their priority, and in the end, to enter a decree which declares as to each water right, "...the priority, amount, purpose, periods and place of use, and as to water use for irrigation, ...the specific tracts of land to which it shall be appurtenant...". N.M.S.A. 1978 Section 72-4-19.  Rights for irrigation, domestic and livestock, municipal, commercial, and recreational purposes are among the rights adjudicated.  Ditch agreements specifying the descriptive details of ditches have also been filed.

Between 1966 and 1969, the Court entered initial non-Pueblo irrigation subfile orders which included all the statutory elements except the priority element.  Most of the

detail of the irrigation water rights appearing in these orders came from the hydrographic survey. In 1992-1993, the Court reconsidered the quantification criteria for irrigated tracts and ordered that Pueblo water quantity be calculated and the non-Pueblo water quantity be recalculated using a more exact formula, the SCS Modified Blaney-Criddle formula. March 1994 Order at p. 7. The quantification of rights as described by the 1966-1969 subfile orders had been determined using the Original Blaney-Criddle formula. The necessary reconciliation has not yet occurred.

As to the priority element, the Court has held that non-Pueblos are not entitled to immemorial priority. February 26, 1987 (Non-Pueblo) Memorandum Opinion and Order at p. 27(No. 2978). Over the years, the Court and the parties have engaged in an extended debate on how to determine irrigation right priorities; that is, whether non-Pueblo priority is to be determined on a tract-by-tract basis or on a ditch-by-ditch basis. In the February 1987 Non-Pueblo Opinion, the Court ruled that the tract-by-tract approach would prevail. *Id.* at pp. 26-27. In 1996, the Special Master recommended that the Court conclude that tract-by-tract approach would not be reconsidered, but the Court declined to close that discussion. February 1998 Order at p. 2.

On May 13, 2002, the judge adjudicating the Rio Pueblo de Taos stream system, 69cv07896, for this District entered a Memorandum Opinion and Order (No. 3026) which allowed the State to employ a ditch-by-ditch approach as a first step in determining priority. The ditch-wide priority would be later refined through claimants' objections during the subfile segment of the adjudication and by objectors during the *inter se* segment.

The Aamodt Court circulated the Taos Opinion among counsel for their consideration, but made no other comment on the matter.

In its February 1987 Non-Pueblo Opinion, the Court ruled on some, but not all, of the issues on the effect of the 1924 Pueblo Lands Act, 43 Stat. 636, on non-Pueblo priorities. The Court has deferred further consideration of these matters until after the Pueblo rights are substantially determined. February 1998 Order.

In 1983, the Court ruled that future non-Pueblo well permitees would no longer be allowed to withdraw up to three acre feet of water per year from Section 72-12-1 wells, but would be limited to indoor use and would be required to install a closed system. January 1983 Order; Tr. at p. 31.   The Court further limited well rights in 1994.   Prior to that time, the quantification element of non-Pueblo water rights in domestic and livestock wells was described with language from N.M.S.A. 1978 Section 72-12-1, "not to exceed 3 acre feet per annum."   On July 22, 1994, the Court ordered that this quantification be amended to an amount defined by historic beneficial use (No. 4391).   The Court has not yet determined historic beneficial use.

In 1996, several post-1982 well claimants challenged the limitations on Section 72-12-1 wells in the 1983 Order.   On May 28, 1998, the Court ordered (No. 5409) that I conduct settlement hearings on these challenges.   An agreement was reached and adopted by the Court on October 4, 1999 (No. 5549).   The Agreement quantified the amount of water which could be withdrawn from each post-1982 well at .7 a/f/a, required metering of each well, and appointed a watermaster to oversee installation of meters and monitoring of well

usage.  About one third of the non-Pueblo post-1982 well defendants have signed the agreement.

The Court appointed  (No. 5632) a watermaster on October 4, 2000 to administer the wells of defendants who joined the agreement and on December 15, 2000 adopted watermaster rules and regulations (No. 5637).  The Watermaster began filing progress reports with the Court on April 8, 2002 (No. 5986).  His second report was made on July 12, 2002 (No. 5989) and additional reports are to be filed every six months thereafter.

Significant portions of the non-Pueblo rights adjudication remain to be completed.  These portions include redetermination of quantity of well rights based on historic beneficial use, redetermination of quantity of irrigation rights based upon application of the SCS Modified Blaney-Criddle method of calculating consumptive use of water, priority determination and errors and omissions work.  A full survey and accounting of non-Pueblo domestic wells must also be completed, although the State has tracked domestic and livestock wells permitted since entry of the post-1982 well <u>Order</u> in 1983.


**<u>Federal Non-Pueblo Rights</u>:**  The State Engineer and the United States filed their September 26, 1984 <u>Amended Stipulation</u> (No. 2025), agreeing to a description and the extent of the United States' non-Pueblo federal reserved rights in the Rio Pojoaque stream system.  They also agreed to defer determination of forest fighting and timber road construction water rights to another time. Stipulation at p. 2.  In late 1984 and early 1985, all parties were given an opportunity to make *inter se* objections to the stipulated federal

water rights.  A hearing on the U.S. Forest Service priority claims was held March 8, 1985. The Court's January 24, 1986 Memorandum Opinion and Order (No. 2752) adjudicated U.S. Forest Service water rights, stayed consideration of the Forest Service's right for firefighting and road building, and specifically recognized that the U.S. Department of Interior, Bureau of Reclamation, Pojoaque Tributary Irrigation Unit of the San Juan-Chama Project and all other U.S. departments and agencies had no water rights in the Rio Pojoaque stream system.  The Court certified the Opinion as a final judgment on April 29, 1986 (No. 2758) and the United States filed its Notice of Appeal on August 15, 1986 (No. 2824).  The appeal was dismissed on the appellant's motion on October 10, 1986 (No. 2852).

In 1990, the Special Master reopened the U.S. Forest Service's deferred claim for fire fighting and road construction water rights.  Subsequently, in his July 11, 1991 Report, he recommended that these rights not be quantified (No. 3773).  No party filed a motion for action and the Court has taken no action on the Report.

**Pueblo Rights:**  On January 6, 1975, the Pueblos appealed the District Court's decision that they were not entitled to representation independent of the United States and that state law applied to the determination of their rights.  The Tenth Circuit reversed this Court, holding that the Pueblos are entitled to independent representation and that federal law applied to the determination of their rights. Aamodt I, 537 F.2d at 1106-1108.  In 1983, the District Court declared all other discussion in this Circuit Court Opinion to be *dicta*

and, therefore, not binding on further proceedings. June 10, 1983 Memorandum Opinion and Order (No. 728).

In 1986, the Court applied federal law to resolve a motion by the State for contempt regarding Tesuque Pueblo's alleged violation of a non-Pueblo water right subfile order relating to a trailer court acquired by the Pueblo. The Court held that the Pueblo a) was not using the state law right developed by a previous, non-Pueblo owner to supply the trailer court, but rather, a federal Pueblo right; b) could use the federal right in any fashion it chose without seeking permission from the State; and c) could apply for state law water rights once it had exhausted its federal law rights. The Court has also ruled that the Pueblo's water rights could be satisfied with surface water and interrelated groundwater. December 1, 1986 Memorandum Opinion and Order (No. 2879) at p. 2.[3]

The Pueblos filed an initial statement of claims on August 23, 1978 (No. 30). Between 1979 and 1982, the Special Master proceeded with defining their water rights. He held hearings on December 10-11, and 13-14, 1979, January 3-4, 21-23, and 30, 1980, February 27, and 29, 1980, April 2, 1980, September 4-5, 1980, October 7, 1980, January 22-23, and 26-29, 1981, and February 4-5, 1981. He filed his findings of fact entitled <u>Pueblos' Historically Irrigated Acreage</u> (No. 626), <u>Pueblos' Water Rights Measured by Irrigable Lands</u> (No. 627), and <u>Rights of the Pueblos Under Spanish and Mexican Law</u> (No. 628) on November 23, 1982. The Special Master heard objections to his findings on February 8,

---

[3]   Later, the Court repeated the ruling on state law water rights in its February 26, 1987 (Pueblo) <u>Memorandum Opinion and Order</u> (No. 2977) at p. 9, December 29, 1993 <u>Memorandum Opinion and Order</u> (No. 4267) at p. 6 and its January 30, 2001 <u>Memorandum Opinion and Order</u> (No. 5642) at p. 5.  It also stated the ruling on interconnected ground and surface water in <u>Aamodt II</u>, 618 F.Supp. at 1010, <u>December 1986 Opinion</u> at p. 2, and <u>January 2001 Opinion</u> at p. 5.

1983.  On August 20, 1984, he filed his <u>Amended Findings of Fact on the Rights of the</u>
<u>Pueblos Under Spanish and Mexican Law</u> (No. 2004) and his <u>Conclusions of Law on the</u>
<u>Rights of the Pueblos Under Spanish and Mexican Law</u> (No. 2003).  On October 2, 1984,
the Court heard objections to the findings and conclusions and the final arguments on the
federal law segment of the Pueblo proceedings.

On September 19, 1985, the Court entered its <u>Memorandum Opinion and Order</u> (No.
2712) regarding the nature and legal foundation of Pueblo water rights. New Mexico *ex rel.*
Reynolds v. Aamodt, 618 F.Supp. 993 (D.N.M. 1985) (Aamodt II).  The Court adopted a
few, modified a few, rejected a few and did not address the bulk of the Special Master's
findings and conclusions relating to Pueblo rights under the law of the successive Spanish,
Mexican and United States governments.  *Id.* at 995-1000.  The Court also addressed the
effect of the <u>1924 Pueblo Lands Act</u>, the <u>1933 Pueblo Compensation Act</u>, 48 Stat. 108 and
other United States' laws as well as equitable apportionment on the Pueblos' water rights.
*Id.* at 1000-1005.  It gave particular attention to their aboriginal rights and introduced
historically irrigated acreage (HIA) as a measure of these rights which is based on
irrigation and which possess an immemorial priority date. *Id.* at 1005-1010.  The Court
recognized that the Pueblos are entitled to reserved a/k/a "<u>Winters</u>"[4] water rights for their
reservation and Executive Order lands and designated practicably irrigable acreage (PIA)
as a measure for these rights.  However, it specifically rejected PIA as a measure for water

_____

[4]  In <u>Winters v. United States</u>, 207 U.S. 564 (1908) (<u>Winters</u>), the Supreme Court created an implied right to
use water on lands set aside by the federal government for Indians living on the Fort Belknap Indian Reservation.
The Court held that when Indians entered into a treaty with the United States, the right to use the waters of the
Milk River were reserved to meet their needs.  The water right measure for these rights, PIA, is first described in
<u>Arizona v. California</u>, 373 U.S. 546 (1963).

rights on other Pueblo lands. *Id.* at 1010.  Finally, the Court recognized that the Pueblos could use both surface and inter-related groundwater to satisfy their aboriginal rights. Id.[5].

The Court certified <u>Aamodt II</u> for appeal at the time it was entered.  The Tenth Circuit declined to review the matter (No. 3092) and the case has proceeded with an understanding that the Pueblo rights will be completed before the Circuit is asked to review them again.  Considerable progress has been made in determining the Pueblo rights since that time.

In July 1986, the Court announced that although further proceedings on Pueblo water rights had been scheduled, the Court would not reconsider any issues already determined in <u>Aamodt II.</u> July 14, 1986 Order (No. 2797).  The Court again declined to reconsider <u>Aamodt II</u> in its April 28, 1987 <u>Order</u> (No. 3036).

**Aboriginal Irrigation Rights:**  It was in <u>Aamodt II</u> that the Court rejected the Special Master's 1982 recommendations on acreage and announced HIA as a measure of aboriginal irrigation rights.  Later, in 1987, it rejected the use of anthropological and archeological data as unreliable for proving HIA, identified the May 20, 1932 Jose Armijo Report and the 1980 Eluid Martinez maps as appropriate evidence of these lands, and made findings of specific HIA awards for each Pueblo.  The use of the Armijo Report limited HIA acreage identification to lands irrigated between 1846 and 1924. April 28, 1987 Findings of Fact and Conclusions of Law (No. 3035), as amended on September 9, 1987

---

[5]  In a later <u>Opinion</u>, the Court clarified that while the Pueblos could use both sources of water to satisfy their rights, they are not entitled to an unlimited right to tap the subsurface water. January 2001 Opinion at p. 9.

(No. 3074).   Specifically, the Court found that Pojoaque Pueblo is entitled to 59.794 historically irrigated acres, as measured by Pueblo irrigation between 1846 and 1924. September 1987 Amended Findings of Fact and Conclusions of Law at p. 3.

Under the Court's rulings, a Pueblo is entitled to HIA rights on reserved lands which lay within the boundaries of its un-extinguished aboriginal territory. February 1987 Pueblo Opinion at pp. 7-9.   The Pueblos made a *prima facie* showing of aboriginal occupancy through the Indian Claims Commission decisions but the showing could be rebutted any other party. May 1, 1987 Memorandum Opinion and Order (No. 3038) at pp. 3-4. When no party filed a rebuttal, the Court held that if a Pueblo could show un-extinguished aboriginal title on particular lands, actual past uses any where within the aboriginal territory would be entitled to immemorial priority. December 1993 Opinion at pp. 2-4.   However, the Pueblos cannot claim both reserved and HIA rights for the same tract of land. *Id.* at 6.   These rights have not yet been determined.   It appears, however, that they are available only to Nambé Pueblo.

**Replacement Rights:**   In its <u>February 1987 Pueblo Opinion</u>, the Court laid the legal foundation for the quantification and prioritization of rights relating to the Pueblos' acquired[6] water rights.   These rights were acquired by the Pueblos to replace water rights related to grant lands lost under the <u>1924 Act</u>. *Id.* at p. 1.   The replacement rights are

---

[6] The Court later recognized that the Pueblos's acquired lands could be either replacement lands or acquired, non-replacement lands. May 3, 1989 Memorandum Opinion and Order (No. 3283) at p. 2. Consideration of rights on the acquired, non-replacement lands has been stayed by the settlement hearings.

associated with lands which lay either inside or outside of the boundaries of the Pueblo grant lands. *Id.* at p. 2. The Pueblos acquired these rights though purchase of or exchange of lands. *Id.* The priority of the rights is equivalent to that of the rights lost, that is, immemorial priority[7]. *Id.* at pp. 4-5. The measure of the acquired rights is HIA. *Id.* at pp. 9-10. The same rules apply if the lands reacquired were once lost through the 1924 Act. *Id.* at pp. 4-5. The measure of water rights for exchange lands would be HIA either on the lands relinquished by exchange or the newly acquired lands, whichever was greater. *Id.* at pp. 9-10.

In May 1987, the Court further detailed the steps necessary for identifying replacement lands and associated water rights. May 1987 Opinion at pp. 1-3. It also identified replacement irrigation works as a source of water rights. *Id.* at 3. In 1989, it rejected the Special Master's January 9, 1989 Report (No. 3181) on the criteria for qualifying purchased lands as replacement lands and ruled that the Pueblos must show that the lands were purchased with funds allocated by the Acts. May 1989 Opinion at p. 5.

In 1993, after briefing and a two-week evidentiary hearing, the Special Master filed his Report on Pueblos' replacement rights. July 20, 1993 Report (No. 4197). The Court heard objections and oral argument on April 19, 1994 and allowed the parties to supplement the record and respond to its specific questions. On March 4, 1999, the parties filed a Joint Report (No. 5496) summarizing their objections to the Special Master's Report. On April 14, 2000, the Court entered its Opinion (No. 5596), ruling on the adequacy of the

---

[7] Also known as "aboriginal priority".

17

Bureau of Indian Affair's records, expanding and amending certain portions of prior opinions regarding replacement rights to avoid manifest injustice to the Pueblos, rejecting the Special Master's findings and conclusions and recommitting the matter to the Special Master for further action.

The Court did not specify replacement acreage in its April 2000 Opinion. Instead, it redefined the legal rules for determining that acreage. Under order of the Special Master, the Pueblos and United States subsequently submitted their July 31, 2000 Memorandum (No. 5617) identifying replacement acreage amounts for each Pueblo under the rules of the April 2000 Opinion. The replacement right identified for Pojoaque Pueblo is 37.47 acres[8]. Pueblos' and United States' July 2000 Memorandum to the Special Master on Replacement Rights of the Pueblos After the Court's Order of April 14, 2000 at p. . Since the settlement stay went into effect shortly after this filing, no challenges have been made.

**Reserved or "Winters" Rights:**  The Circuit discussed the applicability of the Winters doctrine to the Pueblos' reserved water rights at length in Aamodt I.  Later, the District Court noted that this issue was not among those before the Circuit, and declined to be bound by its discussion. June 1983 Opinion at pp. 6, 10-11.

Later in 1985, the Court recognized that the Pueblos were entitled Winters rights on lands reserved for them by the United States government. Aamodt II, 618 F. Supp. at 1010.

---

[8]  The acreage used by the State in its motion and declared in its testimony is 47.47 acres. Tr. at p. 8. Applying an abundance of caution, I have used the 47.47 acre figure in these findings.

It identified <u>Winters</u> rights priority as the date of the reservation's creation and the measure as PIA, unless Congress expressly envisioned a more limited purpose in reserving the lands.  February 1987 Pueblo Opinion at p. 10.[9]  Later that year, the Court gave further instruction on identifying Pueblo <u>Winters</u> water rights and declared immemorial priority only applied to aboriginal uses. May 1987 Opinion at pp. 3-5.

In 1990, the Special Master began work on threshold legal issues involving Pueblo <u>Winters</u> rights for Nambé and San Ildefonso Pueblos.  The Court entered <u>its December 1993 Opinion</u> on the Special Master's <u>August 14, 1992 Report</u> (No. 4012) to clarify the law relating to these issues.    It addressed the criteria for determining a purpose of a reservation and that determination's effect on the type of water rights reserved. November 1997 Opinion at pp. 4-10.  The Court recognized San Ildefonso Pueblo's reserved grazing rights in its January 17, 1997 <u>Memorandum Opinion and Order</u> (No. 5209) and in its April 30, 1998 <u>Partial Judgment</u> (No. 5390).  The Court vacated the Special Master's <u>December 8, 1999 Report</u> (No. 5560) on Nambé's reserved rights and ordered the parties to request, if necessary, a status conference after settlement negotiations under Judge Nelson are completed. July 10, 2001 Memorandum Opinion and Order (No. 5916).

**Domestic and Livestock Rights:** Also in 1990, the Special Master began consideration of Pueblo domestic and livestock water rights.  He filed his <u>September 3,</u>

---

[9]  Later, the Court held that, where Congress has not been specific, the purpose of Pueblo reservations is to create a place for human habitation or homeland for a people. November 14, 1997 Memorandum Opinion and Order (No. 5330) at pp. 7-8.

1996  Report (No. 5100) on threshold legal issues and the Court entered its January 2001 Opinion, adopting some recommendations and rejecting some.

The Court has as yet to adjudicate any specific amounts of domestic and livestock water rights.  However, it has made rulings which affect the aboriginal portion of the domestic and livestock right.  It has held that "[a]boriginal domestic water rights are quantified by the water actually used by the Pueblos between 1846 and 1924.  Unless governed by replacement or Winters right rules, domestic rights acquired after 1924 are defined by state law standards and requirements." January 2001 Opinion at p. 6.


Issues which remain to be completed include determination of the Pueblos' replacement rights, Nambé's Winters rights, and the Pueblos' domestic and livestock rights.


**CURRENT POSTURE OF CASE:**  In the second half of 2000, the parties entered into a mediation agreement to negotiate the settlement of the case with an independent mediator, Judge Nelson. The Court stayed the proceedings before the Special Master by Stipulated Order (No. 5623) on August 31, 2000 and last entered its October 30, 2002 Order (No. 6009) continuing the stay until January 31, 2003.  Every six months the parties have filed a progress report and have requested a continuation of the stay.  The latest report and motion were due in January 2003, but Judge Vázquez granted an extension to February 14, 2003 to accommodate the settlement schedule. January 24, 2003 Order (No. 6043).

Although the State filed its September 12, 2002 motion for an injunction against the Pueblo, settlement talks continue.

**PROCEDURAL HISTORY OF SEPTEMBER 2001 MOTION:**  The State Engineer sent a letter on March 12, 2002 to Pojoaque Pueblo, warning that he would seek a preliminary injunction if the Pueblo began to irrigate a second 18-holes of golf which were then being developed. Tr. at  pp. 10-11, 19-20, 88-89; State Exh. 5.

Thereafter, the Engineer ordered an investigation of the Pueblo's present and projected water uses. Tr. at  p. 21.  He contracted with EnerQuest Systems and on June 21, 2002, the company took aerial photographs of the Pojoaque Pueblo golf course operation. Tr. at pp. 10-11, 21, 81, 85, 97-98; State Exh. 7, p. 1.  Dr. Dario Rodriguez-Bejarano, Office of the State Engineer, performed analysis of the EnerQuest aerial photographs. Tr. at pp. 35, 81; State Exh. 7, at p. 2.  Brian Wilson, Office of the State Engineer, subsequently prepared a water demand analysis to evaluate the Pueblo's current and projected water uses. Tr. at  pp. 13, 33-67; State Exh. 2; State Exh. 3.  He used the same kind of data for the Pueblo study as is used in quantifying water requirements for other communities and similar facilities elsewhere in the state. Tr. at p. 35.  To analyze the present and projected water use for the golf course irrigated turf, he identified values for irrigated acreage, consumptive irrigation requirement, field irrigation efficiency, field delivery requirement, distribution efficiency, project diversion requirement, and conveyance efficiency. Tr. at pp. 35-38, 45-66; State Exh. 3.  He calculated the present and projected water use for the golf

course artificial water bodies. Tr. at p. 38; State Exh. 3.  Mr. Wilson based his estimate of water use at the club house and restaurant on comparisons with other, similar facilities. Tr. at pp. 35, 38; State Exh. 3.

After meeting with and failing to resolve the matter with Pueblo officials, the State filed its September 12, 2002 motion for a preliminary injunction asking the Court to limit the Pueblo's water use until the Pueblo's water rights are finally determined to the *status quo,* as of either March 12, 2002 or June 21, 2002. Tr. at pp. 10-12, 100, 227.  Specifically, the State requests that the Court (a) prohibit the Pueblo from diverting water in excess of the amount allowed by its federal water right, as thus far determined, unless it obtains sufficient state law water rights; (b) prohibit the Pueblo from irrigating a second golf course currently being constructed as well as from using water for a new, not yet constructed,[10] hotel and (c) require the Pueblo to measure and to report all its water uses. New Mexico's September 12, 2002 Motion for Expedited Preliminary Injunction Against the Pueblo of Pojoaque at pp. 2-4; Tr. at pp. 11-13, 100, and 227.  Parties completed briefing the <u>Motion</u> on November 11, 2002. *See* November 18, 2002 *Errata* to State's Reply to the Responses to the Motion for Expedited Preliminary Injunction (No. 6027).

---

[10] The State made its analysis on the basis of a 500-room hotel and the Pueblo testified to planning a 350-room hotel.  Therefore, the numbers used herein have been adjusted to account for a 350-room hotel Tr. at pp. 49, 67, 161; State Exhs.1-3.

The State bases its calculation of the Pueblo's total diversion water right under federal law on:

| | |
|---|---|
| **200.31 a/f/a** irrigation diversion | **59.794** HIA acres (from <u>September 1987 Amended Findings of Fact and Conclusions of Law</u> at p. 3) *multiplied* by **3.35** a/f/a farm delivery requirement (from <u>March 1991 Report</u> at p. 46 as adopted by <u>October 1992 Order</u>) |
| **159.02 a/f/a** replacement diversion | **47.47**[11] Replacement acres (from <u>July 2000 Pueblos' and United States' Memorandum</u> at p. 6) *multiplied* by **3.35** a/f/a farm delivery requirement (from <u>March 1991 Report</u> at p. 46 as adopted by <u>October 1992 Order</u>) |
| **3.23 a/f/a** domestic diversion | **48** people (based on Dr. John Baxter, State's witness' assessment of maximum Pueblo population between 1846 and 1924) *multiplied* by **60 gallons/capita/day** *multiplied* by **365 days/year** (under Court's criteria in <u>2001 Order</u>) *divided* by **325851**[12]. Tr. at pp. 41, 70-71; State Exh. 3 at pp. 14-15; State Exh. 4, pp. 1-3. |
| **0.48 a/f/a** livestock diversion | **maximum livestock population between 1846 and 1924** (based on Dr. John Baxter assessment) *multiplied* by **watering requirement for each species**. Tr. at pp. 42, 72-79; State Exh. 3 at pp. 14-15; State Exh. 4 at pp. 1-3. |

The total domestic and livestock amount is 3.71 a/f/a.

---

[11] See Fn. 8.

[12] The State did not testify to the need to divide the number resulting from the multiplication by the value for the number of gallons in an acre foot. The Court takes judicial notice that this value is 325851. From a definition of acre-foot in <u>www.seo.state.nm.us/doing-business/water-glossary</u>.

These values, when added, total to a 363.04 a/f/a diversion right.[13]

The State bases its calculation of the Pueblo's total depletion water right under federal law on:

| | |
|---|---|
| **110.02 a/f/a** irrigation diversion | **59.794** HIA acres (from <u>September 1987 Amended Findings of Fact and Conclusions of Law</u> at p. 3) *multiplied* by **1.84** a/f/a farm delivery requirement (from <u>March 1991 Report</u> at p. 46 as adopted by <u>October 1992 Order</u>) |
| **87.34 a/f/a** replacement diversion | **47.47** Replacement acres (from <u>July 2000 Pueblos' and United States' Memorandum</u> at p. 6) *multiplied* by **1.84** a/f/a farm delivery requirement (from <u>March 1991 Report</u> at p. 46 as adopted by <u>October 1992 Order</u>) |
| **3.23 a/f/a** domestic diversion | **48** people (based on Dr. John Baxter, State's witness' assessment of maximum Pueblo population between 1846 and 1924) *multiplied* by **60 gallons/capita/day** *multiplied* by **365 days/year** (under Court's criteria in <u>2001 Order</u>) *divided* by **325851**. Tr. at pp. 41, 70-1; State Exh. 3 at pp. 14-15; State Exh. 4 at pp. 1-3. |
| **0.48 a/f/a** livestock diversion | **maximum livestock population between 1846 and 1924** (based on Dr. John Baxter assessment) *multiplied* by **watering requirement for each species**. Tr. at pp. 42, 72-79; State Exh. 3 at pp. 14-15; State Exh. 4 at pp. 1-3. |

These values, when added, total to a 201.07 a/f/a depletion right.

---

[13] The State did not make calculations for the diversion amount described by the project delivery/off-farm delivery requirement. This indicates that all diversions will be from wells, rather than any from surface sources.

A telephonic hearing on jurisdictional and scheduling matters took place before me on November 19, 2002.  The evidentiary hearing on the motion for preliminary injunction was held on November 26, 2002.  The State's evidentiary witnesses included Thomas C. Turney, State Engineer for the State of New Mexico, (Tr. at pp. 13, 16-33), Brian Wilson, P.E., Chief of the Water Use and Conservation Bureau, Office of the State Engineer, (Tr. at pp. 13, 33-67; State Exh. 3), Dr. John Baxter, historian (Tr. at pp. 67-79; State Exh. 4), Dr. Dario Rodriguez-Bejarano, an expert in aerial photography, Hydrographic Survey Bureau, Office of the State Engineer, (Tr. at pp. 13-14, 35, 80-95; State Exh. 7), and Robert G. Kletzli, photogrammetrist, EnerQuest Systems (Tr. at pp. 96-98).  The Pueblo's witnesses included Dennis W. Dulaney, Pojoaque golf course Superintendent (Tr. at pp. 102-133; Pueblo Exh. G), Allen Mosley, Chief Financial Officer for Pojoaque (Tr. at pp. 133-170; Pueblo Exh. E; Pueblo Exh. H), Alyn C. Martinez, Manager of Pojoaque's infrastructure (Tr. at pp. 171-196; Pueblo Exh. D; Pueblo Exh. J), James Pierce, Chief Financial Officer for tribal government programs and services (Tr. at pp. 197-208; Pueblo Exh. I), and George Manuel Rivera, Lieutenant Governor for Pojoaque Pueblo (Tr. at pp. 209-226).

**LEGAL STANDARDS**:  A preliminary injunction is an extraordinary remedy, and therefore, a party's right to relief must be clear and unequivocal. Utah Licensed Beverage Assn. v. Michael Leavitt, *et al.*, 256 F.3d 1061, 1066 (10th Cir. 2001), quoting SCFC ILC, Inc. v. Visa, USA, Inc., 936 F.2d 1096, 1098 (10th Cir. 1991).

A movant seeking a preliminary injunction has the burden to establish that a) the movant has a substantial likelihood of success on the merits; b) irreparable injury will

result to the movant if the injunction is denied; c) the threatened injury to the movant outweighs the injury to the party opposing the preliminary injunction; and d) the injunction would not be adverse to the public interest. Fed. R. Civ. Proc. 65; Dominion Video Satellite, Inc. v. Echostar Satellite Corp., 269 F.3d 1149, 1154 (10th Cir. 2001), citing Utah Licensed Beverage Assn., 256 F.3d at 1065-1066.

The primary function of a preliminary injunction "is to preserve the status quo pending a final determination of the rights of the parties." Resolution Trust Corp. v. Cruce, 972 F.2d 1195, 1198 (10th Cir. 1992), quoting Lundgrin v. Claytor, 619 F.2d 61, 63 (10th Cir. 1980).

The *status quo* is the 'the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing'. Dominion, 269 F.3d at 1155, quoting SCFC ILC, 936 F.2d at 1100 n. 8. When a Court considers a preliminary injunction, the *status quo* is determined from the reality of the existing status and relationship between the parties and not solely to the parties' legal rights. Dominion, 269 F.3d at 1155.

## PRELIMINARY MATTERS AND MOTION TO DISMISS:

**Concurrence Issue:** The Court will not sanction the State for failing to indicate in its motion for preliminary injunction whether it gave notice to or sought to obtain concurrence from other parties before filing this case, even though the State thereby violated the Court's May 5, 1998 Administrative Order (No. 5393). The purpose of the Administrative Order is to facilitate progress in the case. To sanction the State for its recent failure would defeat that purpose and would promote form over function. The

26

Court requires the parties to follow the guidelines in the <u>May 1998 Order</u>, but in this instance, the State's approach is allowed.

**Stay Issue:**  Since the State filed its motion before the Court rather than the Special Master, it did not violate the Court's August 31, 2000 <u>Stipulated Order Staying Further Proceedings Before the Special Master</u> (No. 5623).

**Motion to Dismiss:**  I recommend that the Pueblo's motion to dismiss on the grounds of the State's standing and the Court's jurisdiction to hear this question be DENIED.

The State Engineer has a statutory obligation to administer and protect the public waters of the state of New Mexico. N.M. Const. Art XVI Section 2; N.M.S.A. 1978 Section 72-1-1.; N.M.S.A. 1978 Section 72-2-1; N.M.S.A. 1978 Section 72-12-1; Tr. at pp. 20, 27. Under the statutes, he is responsible for the general supervision of, the measurement and distribution of the waters of the state of New Mexico. Tr. at pp. 17, 20.  He, therefore, has standing to move for a preliminary injunction against the Pueblo.  Just because he has standing does not imply that the State Engineer has any jurisdiction over the Pueblo's water rights.  His concern that another sovereign, Pojoaque Pueblo, has exceeded its entitlement to water and may be encroaching upon water and water rights under his jurisdiction is a legitimate concern.  Whether he will prevail is another matter.  The statutes allow the State Engineer to participate in the adjudication even though he does not claim proprietary rights. *See* N.M.S.A. 1978 Section 72-4-13 *et seq.*.

The Pueblo's challenge to the ripeness of this matter is rejected.  The Pueblo, in essence, argues that it may put water to use without limit until this case has returned from the final appeal since its rights will not be finally determined until then.  This argument is absurd[14].  Some development, within reasonable expectations of water rights under the law as it stands today, is permissible.  However, to allow the Pueblo to develop water uses without check can only harm the greater community, including other Pueblos, the Federal government, and non-Indians as well as the State.  The question of whether the use under the *status quo* is greater than that which may be finally adjudicated is a matter that is ripe for consideration.  Such a determination does not require a specific definition of the Pueblo's entire water entitlement.

The Court has jurisdiction to hear this matter.  Since the question has arisen in the context of the adjudication of the Pueblo's rights, the Court may consider it. N.M.S.A. 1978 Section 72–4-17 (Court may consider of any question necessary for the adjudication of all rights).

**Burden of Proof:**  The legal authority offered by the State for the proposition that as a governmental entity, it has a burden of proof which is lesser than that of another movant, is unpersuasive.  The State's burden is no less than that of any other movant.

---

[14]  See Fn. 5.

**PROPOSED FINDINGS AND CONCLUSIONS**:

**_Status Quo_**:

1.  For purposes of resolving the motion for preliminary injunction, the Pueblo's current actual diversion is first established by the State's June 21, 2002 aerial photographs. Tr. at pp. 11-12, 100.

2.  The _status quo_ for Pojoaque Pueblo's water use is June 21, 2002.

3.  I find the testimony provided by the State's witnesses to be the most credible in establishing water use by Pojoaque Pueblo on June 21, 2002.

a.  I find the testimony provided by the Pueblo's witnesses less credible because , _inter alia,_ it did not address the situation as of that date.

b.  I note that the Pueblo did not dispute any material portion of the State's testimony regarding current use. Tr. 227.


**Pueblo Actual Uses:**

4.  **On June 21, 2002, the Pueblo was diverting at least 447.10 a/f/a and consumptively using or depleting a minimum of 359.12 a/f/a.**[15] Tr. at p. 49.  As of that date, I find the following:

a.  The Pueblo was a) irrigating the first 18-holes of the golf course, plus an additional four holes of the second 18-holes and a driving range, b) storing water in

---

[15]  I am using the totals to which the State's witness, Brian Wilson, testified even though upon adding the component parts of diversion and depletion values, I find that the totals add up to .27 a/f/a less.

artificial water bodies and c) operating one clubhouse and restaurant. Tr. at pp. 9-10; 46-48; 105-109, 126-129, 227; State Exh. 3 at p. 2.

b. The estimated diversions at the Pueblo's golf course, Towa Golf Resort, are a) 274.09 a/f/a for turf irrigation, 30.16 a/f/a for artificial water bodies' evaporative losses and two a/f/a for the club house and restaurant or b) a total estimated diversion of 306.25 a/f/a. Tr. at pp. 45-48, 52, 227; State Exh. 2; State Exh. 3 at pp. 2-6.

c. The estimated depletions at Towa Golf Resort are a) 186.11 a/f/a for turf irrigation, 30.16 a/f/a for artificial water bodies' evaporative losses and two a/f/a for the club house and restaurant or b) a total depletion from the system of 218.27 a/f/a. Tr. at pp. 45-48; State Exh. 2; State Exh. 3 at pp. 2-6.

d. The Tribal Works distribution system serves the North and South Village Residences, all businesses in the South Village commercial district, including the Cities of Gold Casino and Hotel, Credit Union, Jake's Dirty Shorts, sports bar, strip mall, supermarket, Butterfly Springs apartment complex, the trailer court, the travel center, the Phillips 66 gas station, the fire department and the Roadrunner Café. Tr. at pp. 182-3.

e. The Pueblo provides water to the following tribal concerns, exclusive of the golf course operations: the North and South Village Residences, the Cities of Gold Hotel, the Cities of Gold Casino, the Butterfly Springs Apartment Complex, the Butterfly Springs Mobile Home Park, a sports bar, the Po Suwae Geh Restaurant, a gas station, a supermarket, the True Value Hardware Store, the Pizza Inn, two office complexes, the Pueblo convenience store and gas station, the visitor's information center and Tribal Programs including the Bison Project, the Tribal Works, the Accounting Realty, the Kiva,

the Census Department, the Boys and Girls Club, the Senior Citizens Program, the Child Care Program, the Respite House, the Education Program, the Tribal Housing Department, the Tribal Police, the Library, the Wellness Center, the Poeh Cultural Center and Museum, the M.I.S. Department, the Legal Department, the Tax Commission, the Gaming Commission and the Alcohol Beverage Commission.[16] Tr. at pp. 143-5; State Exh. 3 at p. 6-13; State Exh. 8; Pueblo Exh. I; Pueblo Exh. J.

f.  The Pueblo provides water to the following non-tribal concerns: Roadrunner Café, Santa Fe County Fire Department, Jakes' Dirty Shorts (laundry), an apartment complex on the west side of the road, and private individuals. Tr. at pp.176-177, 180, 186; Pueblo Exh. J.

g.  The State estimates that the Pueblo's total water use for its residential and commercial enterprises, including a 5% distribution loss, would cumulatively require a diversion and depletion of 140.58 a/f/a. Tr. at p. 48; State Exh. 2.

h.  Many of the Pueblo's current uses are metered. Tr. at pp. 100, 109, 182-193; Pueblo Exh. G.


**Pueblo's Projected Uses**:

5.  The Pueblo's new projects will require an increase in water use over and above that amount being used on June 21, 2002.

---

[16] At one time, the Pueblo holdings included an automotive center which is now closed. Tr. at p. 144.

6. **The projected amount of diversion, including water for projects to be completed, is 713.8 a/f/a and the projected amount of depletion is 577.94 a/f/a (both values adjusted according to fn. 15.).** Tr. at pp. 49-50; State Exh. 2.

a.   As of that date, the Pueblo was involved in several uncompleted tribal construction projects. Tr. at pp. 49, 137-138, 158, 161; State Exh. 3 at pp. 3, 6, 13.

b.   The additional 14-holes which remained to be developed as of June 21, 2002 will require a diversion of 149.1 a/f/a and a depletion of 101.22 a/f/a. Tr. at p. 49; State Exh. 2; State Exh. 3.

c.   A 350-room hotel will require a diversion and a depletion of about 117.6 a/f/a.[17] Tr. at p. 49; State Exh. 2 as adjusted.

d.   Other projects which would require an allocation of tribal water include: a travel center, a judicial complex, an industrial park complex and renovation to the current shopping center. Tr. at pp. 49, 137-138, 158, 161; State Exh. 3 at pp. 3, 6, 13.

7.   Both the Pueblo and the non-Pueblo communities as well as surrounding area benefit from the Pueblo's development. Tr. at pp. 142, 171-196, 199-208, 211-223, 268-9; Pueblo Exh. I; Pueblo Exh. J.

---

[17] This figure was derived by *dividing* the number of rooms (500) assumed by the State by the amount of water (168 a/f/a) calculated by the State (as set forth in State Exh. 2 and in Brian Wilson's testimony - State Exh. 1 offers a different number), then, *multiplying* that value by the number of rooms (350) to which the Pueblo testified.

**Pueblo's Entitlement Under the Law of the Case to Use:**

8. **Under current rulings, the Pueblo's entitlement to divert and deplete water is described as a farm diversion right of 363.94 a/f/a and a depletion right of 201.07.** Tr. at p. 231.

a.   There have been extensive trials held, reports filed, and opinions entered defining the aboriginal irrigation water rights of the Pueblo. Tr. at pp. 8, 228-231, 237-239, 247-250.

b.   The effect of Spanish and Mexican law upon the Pueblos' irrigation water rights has been fully considered and determined by the District Court. Tr. at pp. 228-231, 237-239, 247-248.

c.   The Court has previously determined that the Pueblo is entitled to HIA for 59.794 acres. Court's April 1987 Findings of Fact and Conclusions of Law, as amended on September 1987. Tr. at pp. 8, 230.

d.   The Pueblo's HIA farm diversion right is 200.31 a/f/a (3.35 a/f/a *multiplied* by 59.794 acres).

e.   The Pueblo's HIA depletion right is 110.02 a/f/a (1.84 a/f/a *multiplied* by 59.794 acres).

f.   The Pueblo's replacement right is based on 47.47 acres. Special Master's 1991 Report at p. 46 as adopted by the Court's 1992 Order; Tr. at pp. 8, 230.  The determination of this right has not been finalized. Tr. at pp. 253, 257; Pueblos' and United States' July 31, 2000 Memorandum.

33

g.  The Pueblo's replacement right farm diversion amount is 159.02 a/f/a (3.35 a/f/a *multiplied* by 47.47 acres).

h.  The Pueblo's replacement right depletion amount is 87.34 a/f/a (1.84 a/f/a *multiplied* by 47.47 acres).

i.  The Court has not yet fully determined Pueblo's domestic and livestock right . Tr. at pp. 8, 15, 232, 239.

j.  Under the Court's rulings as they stand today, the Pueblo's aboriginal domestic and livestock right is 3.71 a/f/a. Tr. at pp. 8, 70-79, 231; State Exh. 1; State Exh. 3 at pp. 14-15; State Exh. 4.

k. Based on the law of the case, the domestic and livestock right is not likely to be determined as substantially larger than it already has been.

9.  Although entitled to acquire state law water rights to satisfy diversions and consumptive uses which exceed the limits of its federal right, the Pueblo has not done so. Tr. at  pp. 151-152, 157-158.

10.  The Pueblo's right to divert and deplete water will be no greater than the amount adjudicated by this Court under federal law and state law.


**Success on the Merits**:

11.  The State has met its burden to show that the Pueblo a) is likely significantly exceeding its federal water rights, b)has not taken measures to acquire additional water rights to meet its current and projected uses and c) is unlikely, under the law as it stands

today to be adjudicated substantially more water rights.   Therefore, the State has a substantial likelihood of success on the merits.

### Will State Suffer Irreparable Injury Unless the Injunction Issues?

12.   The State asserts that, because it is a government entity, it need not make a showing of irreparable injury and that violation of a statute causes irreparable injury *per se*. Tr. at pp. 233-5, 239-245.  I find that this argument is untenable.   Therefore, the State bears the burden of showing that it will suffer irreparable injury unless the Court issues the injunction.

13.   The State has not met its burden of proving that it will suffer irreparable harm if no injunction is issued.

a.   There is insufficient proof that the existing uses of the Pueblo are today affecting any existing water right owned by or protected by the State of New Mexico. Tr. at pp. 32, 252-253, 271.

b.   There is insufficient proof that the projected uses of the Pueblo will affect any existing water right owned by or protected by the State of New Mexico.

### Other Prerequisites for Preliminary Injunction:

14.   Since the State has failed to show irreparable harm, it is unnecessary to examine the third prerequisite to obtaining a preliminary injunction, to wit, whether the threatened injury to the movant outweighs the injury to the party opposing the preliminary

injunction, or the fourth element, whether the injunction would be adverse to the public interest.

### **Other Findings:**

15.   The Pueblos may be entitled to more water rights than the State has acknowledged. Tr. at pp. 251-264.

a.  No appeal has been made to the Tenth Circuit on the Pueblo's ultimate water rights. Tr. at p. 261.

b.  The Court has not entered a final order defining the Pueblo's ultimate water rights. Tr. at pp. 15-16, 261, 267.

c.  The Pueblo will incur losses if the injunction is granted. Tr. at pp. 138-225; Pueblo Exh. I.

### **RECOMMENDED DISPOSITION:**

I recommend that the Pueblo's motion to dismiss be **DENIED,** with prejudice.

I further recommend that State's Motion for a Preliminary Injunction be **DENIED,** without prejudice to its filing another motion for preliminary injunction.

----------------------------

Timely objections to the foregoing may be made pursuant to 28 U.S.C. Section 636(b)(1)(C). Within ten (10) days after a party is served with a copy of these proposed findings and recommendations, that party may file written objections to such proposed findings and recommendations with the Clerk of the District Court.  A party must file any

objections within this time limit if that party seeks review of the proposed findings and recommendations by the District Court.  If no objections are filed, no review will be allowed.

_____/electronic signature/_____
**LESLIE C. SMITH**
**UNITED STATES MAGISTRATE JUDGE**